# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**             Criminal No.  08-306 (RMC)

**v.**

**DELMAR D. SPIER,**
**BARBARA E. SPIER,**

          **Defendants.**
_____/

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through the undersigned attorney, respectfully submits this memorandum in aid of sentencing.

## I.  BACKGROUND

### A.  Procedural History

On September 30, 2008, a federal grand jury returned a multi-count indictment against defendants United States Protection and Investigations, LLC (USPI), Delmar D. Spier, Barbara E. Spier, William F. Dupre, and Behzad Mehr, charging them with Conspiracy to Defraud the Government, Major Fraud, and Wire Fraud.  Following the arrest of the defendants, arraignment, and several status hearings, a motions hearing was scheduled to begin on September 9, 2009, with trial set for September 21, 2009.  On September 9, 2009, defendants Delmar Spier and Barbara Spier pleaded guilty and, as part of the pleas, the case against USPI was dismissed.  Delmar Spier pleaded guilty to all counts in the indictment.  Barbara Spier pleaded guilty to Count One of the indictment.  Sentencing for the Spiers is scheduled for July 2, 2010.

### B.   Factual Background

Delmar and Barbara Spier were the chief officers of a security company called United States Protection and Investigations, LLC (USPI), incorporated in Texas, with offices in Houston, Texas, and Kabul, Afghanistan.   Beginning in June, 2003, through July, 2007, Delmar Spier, Barbara Spier, and others willfully conspired to commit major fraud against the United States in violation of 18 U.S.C. § 1031 and wire fraud against the United States in violation of 18 U.S.C. § 1343.   For the relevant time period (June, 2003, through July, 2007) Barbara Spier was the President and sole owner of USPI and Delmar Spier was the Chief Executive Officer and Managing Director of USPI.   The Spiers controlled all of the financial matters for USPI.

In 2002, the Louis Berger Group, Inc., (LBGI) was awarded a large contract from the United States Agency for International Development (USAID) under the Rehabilitation of Economic Facilities (REFS) Program to build the infrastructure of Afghanistan, such as roads, dams, schools, and other buildings.   Subsequently, LBGI awarded a subcontract (and subsequent subcontracts) under its REFS contract to USPI for it to provide security while LBGI built the roads, etc., in Afghanistan.   Both Delmar and Barbara Spier signed the subcontracts with LBGI.   The USPI subcontracts were cost-reimbursement contracts wherein LBGI agreed to reimburse USPI for all of its incurred expenses arising from the subcontract, plus a fixed-fee of five percent of USPI's incurred expenses.   The five percent fixed-fee represented USPI's profit under the subcontract and USPI was not authorized to bill for expenses that were not actually incurred.

USPI was required to provide supporting documentation for all incurred costs, which included expenses to rent vehicles, purchase fuel, and pay local Afghan security personnel.

2

Such documentation, usually presented as an invoice, would be attached to USPI's voucher, certified by USPI management, including Delmar Spier, and submitted to LBGI.  The vouchers and certifications were submitted to LBGI and became one of the expenses listed in LBGI vouchers that were ultimately submitted to USAID for payment.  LBGI in Kabul, Afghanistan, compiled LBGI's vouchers and emailed or sent them by FedEx to its offices in Washington, D.C., for approval.  LBGI in Washington, D.C., would approve and then submit the voucher to USAID in Afghanistan by electronic mail.

Approximately two years after the contract was awarded, the USAID Office of Inspector General (OIG) initiated an investigation into billing irregularities by LBGI and USPI. Eventually, the USAID-OIG found serious over-billing by USPI for Afghan vehicles, gas, and the local Afghan security personnel used to provide security in Afghanistan.  Eventually, a federal grand jury began to hear evidence about these violations.

As part of the investigation, on August 28, 2007, federal agents in the United States and law enforcement personnel in Afghanistan searched USPI's four corporate offices - two in Kabul, Afghanistan, one in Houston, Texas, and one in Waller, Texas.   Afghan law enforcement personnel and the federal agents seized, among other things, thousands of pages of documents and numerous computers.   The items taken during the searches of USPI's Afghanistan locations were initially seized by the Afghan authorities and eventually shared with the federal agents.

During the course of the investigation, to following facts were uncovered: Starting in approximately January 2004 through June 2007, Delmar Spier, Barbara Spier, and others conspired to and did in fact fabricate invoices from Raza-I-Vehicle Provider Company and Afghan Car Rental Company to inflate the cost of rental vehicles and fuel in the vouchers USPI

submitted to LBGI under the subcontract for the REFS Program.   Raza-I-Vehicle Provider Company and Afghan Car Rental Company were fictitious businesses.   Defendant Delmar Spier and others provided the fabricated invoices from Raza-I-Vehicle Provider Company and Afghan Car Rental Company as supporting documentation to LBGI to justify USPI's inflated expenses. Defendant Delmar Spier and others certified the accuracy and authenticity of USPI's vouchers and supporting documentation containing the fabricated invoices from Raza-I Vehicle Provider Company and Afghan Car Rental.   Defendant Delmar Spier and others negotiated the actual prices for rental vehicles from various providers in Afghanistan and obtained them for substantially less money than what was identified in USPI's certified vouchers that were submitted to LBGI and ultimately USAID.   Defendant Delmar Spier and others caused security personnel from the Afghan Ministry of Interior to be obtained.   Defendant Delmar Spier and others caused USPI employees to add fictitious names to the payroll for security personnel to inflate USPI's expenses.   Defendant Delmar Spier and others then provided supporting documentation for the number of security personnel, usually a sheet of paper with a list of names and a thumb print next to each name, with USPI's vouchers, to LBGI, and ultimately, USAID.

Among others, Defendant Delmar Spier caused the following LBGI vouchers containing inflated expenses from Washington, D.C., to be submitted to USAID in Kabul, Afghanistan: (1) LBGI Voucher #52 and wire transfer request to USAID, including reimbursement for USPI Voucher #40 (certified by William Dupre) for the Kandahar to Herat project; LBGI Voucher #174 and wire transfer request to USAID, including reimbursement for USPI Voucher #51 (certified by William Dupre) for the Kandahar to Heart project; and LBGI Voucher #206 and

wire transfer request to USAID, including reimbursement for USPI Voucher #65 (certified by Defendant Delmar Spier) for the Kandahar to Herat Project.

## II.   SENTENCING STANDARDS

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Sixth Amendment, as construed in Blakely v. Washington, 542 U.S. 296 (2004), applies to the United States Sentencing Guidelines (hereinafter "USSG," "Sentencing Guidelines" or "Guidelines"). Accordingly, the Supreme Court "imposed a global remedy for the Sixth Amendment difficulties with the Sentencing Guidelines, invalidating their mandatory application and instead requiring district courts to consult them in an advisory fashion."   United States v. Labastida-Segura, 396 F.3d 1140, 1142 (10th Cir. 2005).   Thus, the sentencing court must fashion a reasonable sentence guided by the factors specified in 18 U.S.C. Section 3553(a), including correct application of the sentencing guidelines.   United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005).   Although the sentencing judge also must weigh the other factors enunciated in 18 U.S.C. § 3553(a), "it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a sentencing judge."   United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

Booker requires judges to engage in a two-step analysis to determine a reasonable sentence that begins with properly calculating the applicable guideline range and then involves application of the Section 3553(a) factors.   Gall v. United States, 128 S.Ct. 586, 169 L. Ed. 2d 445 (2007); United States v. Doe, 412 F. Supp. 2d. 87, 90 (D.D.C. 2006).   This process has been described as follows:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.   Then, the court shall consider that range as well as other relevant factors set

> forth in the guidelines and those factors set forth in [18 U.S.C.] §
> 3553(a) before imposing the sentence.

Doe, 412 F. Supp. 2d at 90 (quoting United States v. Clark, 434 F.3d 684, 685 (4th Cir. 2006

(internal citation omitted)).

The Supreme Court has held that a sentence within a properly calculated sentencing

guideline is presumed to be reasonable.   Rita v. United States, 127 S.Ct 2456, 168 L.Ed. 2d 203

(2007).   Indeed, the Court noted that the Sentencing Commission in developing a sentencing

framework and the sentencing judge in crafting an appropriate sentence consider the same

general factors in 18 U.S.C. Section 3553(a).   Id. at 2463 ("The upshot is that the sentencing

statutes envision both the sentencing judge and the Commission as carrying out the same basic §

3553(a) objectives, the one, at retail, the other at wholesale.").   Thus, while the district court

must make an individualized assessment based upon the facts presented, if the court chooses a

sentence within a properly calculated guideline, the court of appeals may presume that such a

sentence is a reasonable one.

As for the second step of the Booker sentencing analysis, the court in imposing a

sentence must as well consider the other factors of Section 3553(a):

> These factors include, among others, the nature of the offense, the
> defendant's history, the need for the sentence to promote adequate
> deterrence and to provide the defendant with needed educational or
> vocational training, any pertinent policy statements issued by the
> Sentencing Commission, the need to avoid unwarranted sentencing
> disparities among similarly situated defendants, and the need to
> provide restitution to any victims.

Price, 409 F.3d  at 442 (D.C. Cir. 2005) (citing 18 U.S.C. § 3553(a) (2000) (amended 2003)).

Another pertinent factor in Section 3553(a) is the need for the sentence imposed to protect the

public from further crimes of the defendant.

### III.   GOVERNMENT'S POSITION ON SENTENCING

**A.      The Defendants Deserve an Appropriately Significant Punishment Under the Guidelines.**

As indicated in the Presentence Investigation Report, the applicable guideline for Defendant Delmar Spier in this case is found at USSG § 2X1.1 and § 2B1.1(a)(1) and the appropriate Base Offense Level for him is 7.   From that point, Defendant Delmar Spier's calculation receives an 18-level increase because of the loss amount in this case (see USSG § 2B1.1(b)(1)(J)) and a three-level increase because he was a leader or organizer of the conspiracy (see USSG § 3B1.1©).   Once Defendant Delmar Spier is given a three-level reduction for Acceptance of Responsibility in this case, he is left with a Total Offense Level of 25.

For Defendant Barbara Spier, the applicable guideline is found at USSG § 2X1.1 and § 2B1.1(a)(2) and the appropriate Base Offense Level for her is 6.   Defendant Barbara Spier's calculation is given the 18-level increase and then, according to the U.S. Probation Officer's Presentence Investigation Report, then a two-level decrease because she was a "minor participant" (see USSG § 3B1.2(b)).   She also receives a three-level reduction for Acceptance of Responsibility.   Thus, the Total Offense Level for Defendant Barbara Spier is 19.   The government notes, however, that under the terms of the plea agreement, the parties stipulated that Defendant Barbara Spier was a minimal participant, which would decrease her offense level by four levels (not two).   Under that calculation and the terms of the plea, the parties agreed that Defendant Barbara Spier qualifies for an adjusted Offense Level of 17.

Defendant Delmar Spier's Total Offense Level of 25, in conjunction with his criminal history score of zero (placing him in Criminal History Category I), gives him a guideline range

for imprisonment of 57 to 71 months (see USSG Chapter 5, Part A).   According to the

Presentence Investigation Report, Defendant Barbara Spier's Total Offense Level of 19, in

conjunction with her criminal history score of zero (placing her in Criminal History Category I),

gives her a guideline range for imprisonment of 30 to 37 months.

The Court should impose a sentence within the guideline range for each Defendant.

Such a sentence for each Defendant would increase the likelihood that the Defendants receive a

sentence that is consistent with other offenders who have committed the same or similar

conduct.   See Booker, 543 U.S. at 253, 255 (observing that the goal of the Sentencing

Guidelines is to "move the sentencing system in the direction of increased uniformity,"   so that

"offenders who engage in similar real conduct would receive similar sentences.").   Further, by

imposing a sentence within the applicable guideline ranges, the Court would be recognizing that

each Defendant received the benefit of his/her acceptance of responsibility, appropriate level of

responsibility in this case, and consideration for the lack of any prior criminal record.

**B.      The Defendant Deserves a Significant Punishment Under Section 3553.**

The government respectfully submits that the factors under Title 18, United States Code

Section 3553(a) independently support a sentence within the guideline ranges for each

Defendant.

**1)   Nature of the Offense**

As discussed above, the Defendants were the chief officers in a company that received a

substantial amount of trust and funding from the federal government.   The Defendants abused

that trust when they defrauded the government and/or conspired to defraud the government of

millions of dollars.   Their company, and the fact that most of their business was conducted far

from any governmental oversight, indicated just how unique this situation was at the time of the

offenses.   The Defendants betrayed that unique trust and, therefore, harmed others and the

government in ways beyond the financial loss in this particular case.   Corruption such as this

taints the public perception of the honesty and integrity of the U.S. government, both here and

abroad.   Government contract fraud like this harms all of the federal contracts and contractors

and greatly harms our government's ability to conduct business in foreign countries.   Also, this

type of fraud undermines the efforts of the vast majority of federal contractors who are honest,

hard-working, and dedicated to providing a service to the U.S. government.

　　　The Defendants' offenses are marked by several aggravating factors.   First, Defendant

Delmar Spier masterminded a scheme to defraud the U.S. government of millions of dollars.

This scheme, although simple in plan, was quite extensive in scope and operation.   Defendant

Delmar Spier ordered that his underling(s) set up fictitious companies to hide the true costs of

doing business under the REFS contract.   He directed his employees to criminally alter the

invoices that were submitted to LBGI and USAID.   Even assuming, arguendo, the Defendants'

propounded excuses for their actions, there is no indication that they ever tried legitimate and

legal methods to improve the situation.   Never did the Defendants bring any such problems to

the attention of USAID.   Furthermore, the Defendants repeatedly flouted any assistance offered

by USAID or LBGI.   Second, the Defendants' operation was not an isolated event - the plan

lasted for a significant amount of time and there is no reason to believe that the Defendants'

criminal activity would have stopped without the intervention of criminal law enforcement.

Third, the Defendants (particularly Defendant Delmar Spier) premeditated and carefully planned

the criminal activity over a period of several years.   Unlike a crime of passion or impulse, in this

case the Defendants had many opportunities to reconsider their actions.   At each such turn, the Defendants took the wrong path, choosing self-enrichment over any duty to the U.S. government.

### 2)   History and Characteristics of the Defendant

It should be noted that the Defendants accepted the government's plea offers, although not at an early stage.   The pleas were accepted well after the indictment and just prior to the commencement of trial.   At that time, they took responsibility for their criminal actions in this case.

According to the Presentence Investigation Report, the Defendants have no prior criminal record, placing them in Criminal History Category I.   Also, Defendant Delmar Spier actually worked for a period of time as a law enforcement officer.   His conduct in this case, therefore, is particularly noteworthy.

### 3)   The Need for the Sentence to Reflect the Seriousness of the Offense

A sentence of incarceration within the guideline range would reflect the seriousness of the Defendants' conduct and would provide just punishment for their actions.   Moreover, in fashioning an appropriate sentence, the Court must consider the important policy underlying § 3553(a) -- that similarly situated offenders should be treated similarly.   See 18 U.S.C. § 3553(a)(6).   From this perspective, a sentence of incarceration within the guideline range for the Defendants' conduct and criminal history score would also provide reasonable assurance that the Defendants will be treated fairly when compared to similar offenders.   The Defendants cannot point to any exceptional circumstance that warrants a sentence below the "heartland" the Sentencing Guidelines are intended to capture.   See USSG ch. 1, pt. A, comment 4(b) (defining

the "heartland" as "a set of typical cases embodying the conduct that each guideline describes," and noting that "[w]hen a court finds an atypical case . . . the court may consider whether a departure is warranted").

### 4)   The Need for the Sentence to Afford Adequate Deterrence

A sentence of incarceration within the guidelines range would serve as an important deterrent to others, especially government contractors, who might consider whether to follow the Defendants' actions.   Further, a sentence below the Defendants' guideline range could have the unintended consequence of downplaying the significance of the criminal conduct they displayed. A reduced sentence here would have little or no deterrent impact on others in the Defendants' position.

## IV.   CONCLUSION

The United States respectfully requests that the Court sentence Defendant Delmar Spier and Defendant Barbara Spier to incarceration within the guidelines range and in accordance with the factors articulated in 18 U.S.C. § 3553(a), to punish them for their conduct and to deter others who might consider committing similar crimes.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar #447-889

JENNIFER R. TAYLOR
D.C. Bar #497349
United States Department of Justice
Criminal Division, Fraud Section


　　　*/s/ David J. Gorman*
DAVID J. GORMAN

-11-

ASSISTANT UNITED STATES ATTORNEY
Virginia Bar #31167
555 Fourth Street, NW, Room 5828
Washington, DC 20530
(202) 514-7426
david.gorman2@usdoj.gov


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the United States' Memorandum In Aid of Sentencing dated June 25, 2010, was served, via the Electronic Filing System, to counsel of record on this 25th day of June, 2010.


*/s/ David J. Gorman*
DAVID J. GORMAN
ASSISTANT UNITED STATES ATTORNEY